In re BARKLEY–CUPIT ENTERPRISES, INC., Debtor.

The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, Plaintiff,

v.

BARKLEY–CUPIT ENTERPRISES, INC., Defendant.

Bankruptcy No. 81–01483A.
Adv. Nos. 81–0702A, 81–0809A.

United States Bankruptcy Court,
N. D. Georgia,
Atlanta Division.

July 13, 1981.

David A. Handley, Atlanta, Ga., for Equitable Life Assurance Society of United States.

William G. McDaniel, Alan L. Dye, Atlanta, Ga., for Barkley-Cupit Enterprises, Inc.

WILLIAM L. NORTON, Jr., Bankruptcy Judge.

## FINDINGS OF FACT

1. Barkley-Cupit Enterprises, Inc., a Georgia corporation, filed a Voluntary Chapter 11 Petition on April 6, 1981.

2. The primary asset of the Debtor is a country club and the appurtenances thereto known as the Rivermont Golf and Country Club (hereinafter referred to as the "Club"). The Debtor first came into possession of the Club in 1973 pursuant to a Lease-With-Option-To-Purchase Agreement (hereinafter referred to as the "Lease") entered into by and between the Debtor's predecessor and a joint venture comprised of Equitable Life Assurance Society of the United States (hereinafter referred to as "Equitable") and Roy D. Warren Company, Inc., a Georgia real estate sales corporation.

3. In 1975, the joint venture was dissolved as a result of the bankruptcy of Roy D. Warren Company, Inc., and Equitable subsequently was substituted as lessor under the Lease.

4. The Lease was for a term of seven (7) years, beginning April 16, 1973, and ending April 15, 1980. (Lease, ¶ 5–C.) There was no rent due and payable under the Lease.

5. The Lease, as modified, also contained a provision giving the Debtor an option to purchase the Club on April 15, 1980, for the sum of $1,080,000.00. To exercise the option, the Debtor was required to notify Equitable, in writing, of its intent to exercise the option on or before April 15, 1979. (Lease, ¶ 5–H.)

6. On April 5, 1979, William Barkley, one of the Debtor's two shareholders and president of the corporation, caused to be delivered to Equitable written notice of the Debtor's exercise of the option to purchase.

7. The next day, on April 6, 1979, the Debtor filed a Complaint against Equitable in the United States District Court for the

Northern District of Georgia, Atlanta Division, seeking damages for violations of the Sherman Act, wrongful actions in connection with the Lease, tortious interference with the Debtor's business, and other wrongful acts. Thereafter, and after the April 15, 1979 deadline for exercising the option, Equitable filed a counterclaim in the District Court action in which it contended that Mr. Barkley's April 5, 1979 notice was inadequate as an exercise of the option and in which Equitable sought a declaratory judgment that, because of this alleged inadequacy, the Debtor's option to purchase had lapsed.

8. After extensive discovery, both the Debtor and Equitable filed Motions for Summary Judgment on the issue of the adequacy of the April 5, 1979 notice as an exercise of the option to purchase. On January 31, 1980, the District Court granted the Debtor's Motion for Summary Judgment and denied Equitable's Motion, holding that the Debtor had timely, validly, and effectively exercised its option to purchase the Club. Equitable's appeal from the judgment entered on that order is pending before the United States Court of Appeals for the Fifth Circuit.

9. After the adverse ruling in the District Court, Equitable instituted a dispossessory proceeding in the State Court of Fulton County seeking to oust the Debtor from the Club. The basis for the initiation of the dispossessory proceeding was Equitable's contention that the Debtor had failed to follow through on the exercise of the option by tendering the purchase price of the property prior to April 15, 1980, the date on which the Lease expired.

10. The State Court of Fulton County granted a summary judgment to Equitable. Several days later, however, on June 26, 1980, the District Court entered an injunction enjoining Equitable from pursuing dispossessory proceedings in the Georgia courts pending final resolution of the District Court action. The basis for the injunction was that the District Court had already ruled on the issues raised in the State Court and that an injunction was necessary to preserve the District Court's jurisdiction.

11. Before the injunction order was entered, the Debtor had filed an appeal from the summary judgment entered in the dispossessory proceeding. The District Court's injunction did not bar the Debtor from pursuing the appeal, and the issue was fully briefed and argued by both parties before the Georgia Court of Appeals. The appeal resulted in a reversal of the judgment dispossessing the Debtor.

12. Thereafter, on January 22, 1981, in order to prevent litigation of identical issues in two separate forums, the District Court enjoined the State Court proceedings in toto.

13. Equitable responded to the first injunctive order by filing another appeal to the United States Court of Appeals for the Fifth Circuit. In addition, Equitable filed a motion in the District Court seeking to compel the Debtor to post security under Rule 65(c) of the Federal Rules of Civil Procedure for the payment of such costs and damages as Equitable may incur or suffer in the event of a later determination that the injunction was wrongful.

14. The Debtor opposed the Motion to Compel the giving of security, and both parties presented voluminous affidavits, appraisals, and briefs to the District Court in support of their respective positions. In the face of conflicting evidence and positions, the District Court appointed an independent expert to determine and recommend what would constitute proper security for purposes of Rule 65(c).

15. The independent expert submitted to the District Court a "Summary Report" wherein he recommended that the Debtor be required to pay into the registry of the Court $10,350.00 per month. The independent expert found this amount to be "[t]he minimum fair rental value of the property in question for the period commencing April 15, 1980, and extending for the duration of this litigation (estimated at two years). . . ." The independent expert arrived at this figure by considering the market value of the Club and determining the return Equitable could reasonably have re-

ceived on $1,080,000.00 if the Debtor had tendered the purchase price of the Club on April 15, 1980.

16. In an order dated March 6, 1981, the District Court adopted the report and recommendation of the independent expert and directed the Debtor to post security in the amount of $10,350.00 per month for the duration of the litigation. The District Court also made its order retroactive to April 15, 1980, in essence requiring the Debtor to make a lump sum payment into the registry of the Court of more than $110,000.00.

17. Before the payment became due, the Debtor, on April 6, 1981, filed the instant Petition in an effort to effect a reorganization under Chapter 11 of the Bankruptcy Code.

18. Almost immediately after the petition was filed i. e., on April 17, 1981, Equitable instituted this adversary proceeding under Part VII of the Bankruptcy Rules seeking relief from the automatic stay of 11 U.S.C. § 362, adequate protection of its alleged interest in the Club, and, alternatively, possession of the Club.

19. A hearing was held on May 18, 1981, after which this Court ordered that the automatic stay remain in effect until further order of the Court, except that the Debtor's request for relief from the stay with regard to the appeals pending in the United States Court of Appeals for the Fifth Circuit was granted. At a subsequent conference in chambers between and among the Court, counsel for the Debtor, and counsel for Equitable, it was agreed that another hearing would be held on June 17, 1981, at which the sole issue would be Equitable's request for adequate protection. The parties agreed to restrict the evidence to that which was presented to the District Court in connection with Equitable's Motion to Compel the Giving of Security under Rule 65(c) of the Federal Rules of Civil Procedure. That record before the District Court has been reviewed by this Court.

20. In March of 1980, the Debtor retained an expert appraiser to inspect the Club, study the country club market, determine the Club's competitiveness and profitability, examine growth trends and employment opportunities in the area, compare the Club to other, comparable country clubs, and, ultimately, appraise the property and arrive at a fair monthly rental rate. Equitable retained an expert of its own, Mr. Reynolds Couch, who filed an Affidavit of Appraisal which bears no date but which apparently was attached to Equitable's Motion to compel the Giving of Security filed in the District Court. Mr. Couch's Affidavit, which is four pages long, values the Club at $1,500,000.00 and estimates that a "reasonable net monthly rate" for the Club "would be in the range of $12,500.00 to $15,000.00." The report prepared by the Debtor's appraiser, on the other hand, consists of 36 pages of extensive, in-depth discussion of current market forces and the value and profitability of the Club. That report has been referred to by the parties as the "Landauer Report." There is no significant difference between the market value of the property as determined by the Debtor's appraiser and the market value as determined by Equitable's appraiser. However, the Court is impressed by the quality and thoroughness of the Landauer Report and accepts many of the conclusions stated therein.

21. The statistical data contained in the Landauer Report reflects a likelihood that the number of upper-level corporate management jobs in the region reasonably proximate to and potentially served by the Club will increase substantially in the next few years. Consequently, a large number of people with incomes sufficient to enable them to purchase homes in Rivermont and to become members of the Club will be relocating within "membership distance" of the Club over the next several years.

22. According to the Landauer Report, the Club compares favorably with other country club communities in the Metropolitan Atlanta area, and offers significant and desirable amenities to members and potential members. The amenities include an 18-hole golf course, a 17,000 square foot clubhouse, complete with dining and lounge

facilities, men's and ladies' locker rooms, a steam room and saunas, showers, a golf pro shop, cart and bag storage, administrative offices, 8 lighted hard surface tennis courts, a swimming pool, a maintenance building, and two small service buildings for the tennis and swimming operations. The Club encompasses approximately 181.5 acres.

23. The Laudauer Report asserts, and there is no contrary evidence, that the Fulton County Tax Appraisers have appraised the Club and have estimated its value at $1,716,480.00. The property is currently being put to its highest and best use.

24. The Landauer Report predicts that the Rivermont Development Project, which is owned by Equitable and of which the Club is a part, will "capture a larger than normal share of new home buyers." Rivermont is expected to attract purchasers because Equitable is in a position to obtain attractive financing for permanent loans to home purchasers. At the time of the Landauer Report, 90% of the homes in the Rivermont Subdivision were financed with Equitable loans, with non-escalating interest provisions in the event of assumption.

25. In its operation of the Club, the Debtor derives revenue from initiation fees, monthly dues, food and drink charges, guest fees, golf cart rentals, locker rentals, bag storage, and driving range charges. If the Club were subject only to normal market forces and not to the adverse effects of publicity engendered by the long running dispute between Equitable and the Debtor, Club operations could, according to the Landauer Report, be expected to produce a profit in excess of $150,000.00 for each of the next three years.

26. The market value ascribed to the Club by the Landauer Report, which is based on the assumption that the Club is a going concern and a profitable enterprise, is $1,800,000.00. Contrary to the Landauer Report's assumption, however, the Club has never experienced a profitable year from operations.

27. The appraisals of the property are substantially in agreement that the monthly rental value thereof is in excess of $12,-500.00. However, as the independent expert appointed by the District Court apparently concluded, the Debtor is not a "tenant" of Equitable, but is an alleged vendee in possession, which the District Court ruled was the contractual status between Equitable and the Debtor. If the sale had been consummated, Equitable would have received the purchase price of $1,080,000.00. That money, in turn, could have been used by Equitable to generate additional investment income. Accordingly, the independent expert determined a fair rate of return which Equitable could have expected to receive on an investment of the purchase price, and then recommended to the District Court that the amount of that expected return be deposited by the Debtor into the registry of the District Court. That amount, as noted above, was $10,350.00 per month.

28. The District Court made no ruling regarding to which party the $10,350.00 payments would or should be paid, said determination apparently being reserved until further order of the Court. If the order of the District Court is affirmed, the fund might be paid to Equitable as the earnings it should have received on the exercise of the option to purchase on April 15, 1980. If the order is reversed, and no purchase is allowed, the prior lease is expired and Equitable would be entitled to possession of the Club. In that event, Equitable might also be entitled to damages for the delay for the period between the expiration of the lease and Equitable's gaining possession of the premises. Those damages might be:

(a) Nothing, since no rent was reserved under the lease other than maintenance of the Club, or

(b) Some amount of money constituting "reasonable" rental value of the premises.

Thus, if Equitable prevails on its appeal, either the Debtor or Equitable might be entitled to any fund created.

29. Because the Lease had expired on April 15, 1980, at which time Equitable would, under normal circumstances, have

become entitled to the purchase price, the District Court determined that "proper security" under Rule 65(c), Federal Rules of Civil Procedure, required a deposit into the registry of the Court of $10,350.00 per month for each month subsequent to that date. Equitable contends that, whatever amount of money, if any, this Court determines would provide adequate protection, that amount should be made payable from April 15, 1980.

30. However, the Court's duty under 11 U.S.C. § 362 is to provide adequate protection of Equitable's interest during the pendency of the Chapter 11 case, that is, to maintain the status quo of economic rights in property existing at the time of filing and to accord to the secured creditor its benefits in the prior bargain [1] with the Debtor. It is not the responsibility of the Court under 11 U.S.C. § 362 to require compensation to Equitable for any damages or losses it may have sustained prior to the filing of the Chapter 11 petition and therefore as a result of causes other than the automatic stay of Section § 362. The Court must determine whether the automatic stay has adversely affected Equitable's economic interest in property, and has prevented Equitable from protecting its interest in the property and, if so, how Equitable's interest, *as affected by the automatic stay*, may be protected.

31. As explained in the July 1, 1980 affidavit of Weldon Van Pelt, Equitable's local manager, the Lease did not require the Debtor to pay any rent to Equitable during the term of the Lease. The Club is a crucial and important amenity to Equitable's development project, designed to attract potential home buyers to Equitable's subdivision. Because of the substantial benefit derived by Equitable from the existence and operation of the Club as part of the development project, Equitable agreed in the Lease to lease the Club to the Debtor in return for the Debtor's agreement to operate, improve, and maintain the Club and to make the Club available to Rivermont residents as an amenity to living in the subdivision. The Debtor is still providing those services called for by the Lease, and therefore Equitable is presently receiving the same consideration that it bargained for under the Lease.

32. Moreover, the automatic stay of 11 U.S.C. § 362 is not the sole cause of Equitable's inability to take possession of and to lease to another tenant the Club premises. Prior to the filing of this case under Title 11 U.S.C., Equitable was already enjoined by the District Court from attempting to dispossess the Debtor in the Georgia courts, and Equitable's right to possession was a matter under consideration in litigation pending in the District Court. Even in the absence of the Title 11 U.S.C. automatic stay, therefore, Equitable could not have leased the Club to another entity at the "fair rental value" of the property. Equitable, therefore, is not entitled after the filing of this Title 11 U.S.C. case to receive the Club's fair rental value from the Chapter 11 Debtor.

33. In any event, this Court also finds that the "fair rental value" of the Club as determined by the appraisers retained by the parties was based on the assumption that the Club had some ongoing concern value as a profitable enterprise. To the contrary, the most recent financial statements of the Debtor prior to its Chapter 11 petition reveal that the Club has *never* been profitable. Accordingly, under the facts of this Chapter 11 case, the Court does not find the fair rental value as determined by the appraisers to be an appropriate measure of "adequate protection" under the Bankruptcy Code.

34. As to the pre-petition obligation of the Debtor to post security in the District Court in connection with the preliminary injunction, that obligation does not confer upon Equitable an interest in *property* of the debtor which would be entitled to adequate protection. Any amount to which Equitable may have been entitled before the Chapter 11 Petition was filed is mere pre-petition, unsecured debt, equivalent to unpaid rent.

---

1. H.R.Rep.No.95–959, Sec. 361, p. 339, U.S. Code Cong. & Admin.News 1978, p. 5787.

### CONCLUSIONS OF LAW.

■ (a) *Adequate Protection* : An entity having an interest in property of the estate or property in the possession of the estate is entitled to adequate protection of that interest under 11 U.S.C. § 362(d)(1) to the extent necessary to preserve that entity's position as it existed at the time of the filing of petition for relief under Title 11 U.S.C. To be entitled to adequate protection, an interest must be an interest in specific property of the estate or specific property in the possession of the estate. Entitlement to a sum of money from a debtor, *e. g.*, as "proper security" under Rule 65(c), Federal Rules of Civil Procedure, is not an "interest in property" entitled to adequate protection under 11 U.S.C. § 362(d). Accordingly, Equitable's "interest" in the security the District Court ordered to be deposited into the registry of the Court, which interest is the equivalent of an unsecured, pre-petition claim, is not property entitled to adequate protection.

■ The District Court's determination of what would constitute "proper security" under Rule 65(c) of the Federal Rules of Civil Procedure was not the equivalent of a determination of what would constitute "adequate protection" under 11 U.S.C. § 362(d)(1). The posting of security under Rule 65(c) is designed to protect the party enjoined from costs and damages "directly sustained as the result of an improvident issuance of the . . . injunction." 7 *Moore's Federal Practice* ¶ 65.09 at 65–94. Section 362 of the Bankruptcy Code, on the other hand, is not designed to provide a fund for use in compensating a creditor in the event of a later determination that an injunction was improvident. The "injunction" imposed by § 362 is automatic and therefore is not a discretionary matter allowing an "improvident" decision. Consequently, "adequate protection" is designed to protect the creditor's interest as it exists *at the time of the filing of the petition,*[2] and to prevent

damage and loss to a creditor's interest occurring after the filing, and is not designed to compensate the creditor for losses it *might* have suffered prior to the filing of the Chapter 11 petition. Consequently, this Court must make an independent evaluation of Equitable's status in this case in order to determine what constitutes adequate protection of its interest in property held and used by this Chapter 11 Debtor. Any pre-petition debt is unsecured and contingent, and can be dealt with in the Plan of Reorganization. As to the pre-petition obligation to post Rule 65(c) security, therefore, no adequate protection is necessary or appropriate as a condition to continuation of the Section 362 stay. An analysis of Equitable's rights to economic protection in property used by the Debtor is required.

Equitable's allegation that it is entitled to ownership and possession of the Club, if true, gives Equitable an "interest" in the Club, which, if endangered, must be adequately protected under 11 U.S.C. 362(d)(1).

■ Equitable's claim, being a claim to a specific piece of property rather than a claim to a liquidated amount of money, would be adequately protected if the property claimed is maintained in good condition. If the Club is ultimately determined to belong to Equitable, then Equitable would receive full satisfaction of its claim upon turnover of the Club by the Debtor.

The present market value of the Club substantially exceeds the option purchase price specified in the Lease. Thus, an "equity cushion" exists, and if the District Court is upheld, and this Court must assume that it will be, Equitable's interest is not imperiled. If the Debtor is unable to tender the purchase price, Equitable will be entitled to the Club, and would receive a windfall of the equity cushion. If a Plan is presented within the Debtor's exclusive period of 120 days as provided for in 11 U.S.C. § 1121(b), and is confirmed, Equitable would be protected by the equity in the property.

---

**2.** Massari, *Adequate Protection Under the Bankruptcy Reform Act*, 1979 Annual Survey of Bankruptcy Law 171, 172–73. Cf. Pickett, Gardner & Landers Associates, 3 Bankr.Ct.Dec. 727 (N.D.Ga., August 9, 1977) and Carousel Limited Partnership, 3 Bankr.Ct.Dec. 698 (N.D. Ga., Sept. 1, 1977)

Alternatively, Equitable's alleged interest would be adequately protected during this Chapter 11 case if this Court were to continue in force the terms of the expired Lease. The terms of the Lease are the best evidence of the parties' estimation of the value of the Club, and the Lease reflects what each party considered to be a fair exchange of benefits. Accordingly, adequate protection of Equitable's alleged interest requires that the Debtor continue to operate and maintain the Club as an attraction to potential purchasers of homes in Equitable's subdivision.

The asset of which Equitable seeks possession is an unusual one, constituting virtually the sole asset of the Debtor. The Club obviously is of such value to Equitable that Equitable was willing to accept, even bargained for, its maintenance and operation by the Debtor during the term of the Lease even without the payment of rent.

The Debtor is either a vendee in possession as found by the District Court, which this Court must assume is correct until the Fifth Circuit has ruled, or the Debtor is a tenant holding over. If the Debtor is a vendee in possession, Equitable is entitled to the option purchase price. Equitable may not be entitled to anything over and above this option purchase amount. On the other hand, if the Debtor is a tenant holding over, Equitable might eventually be entitled to damages.

The Court finds that Equitable is entitled, under either condition, to nothing at the present time as adequate protection of its interest, and may never be entitled to anything other than the option price if the District Court order is affirmed. Accordingly, adequate protection does not require that the Debtor post any money as a "security fund" for possible future payment to Equitable.

However, the Court notes that the Debtor has offered to pay $12,500.00 per month into an escrow account under court supervision as previously required by this Court in the order filed June 23, 1981. The Court is impressed by this evidence of the Debtor's good faith, and observes that the offer to create such escrow fund reflects favorably on the Debtor's positive potential for effecting a successful reorganization. The escrowed funds may later serve as a substantial source of funds for the Debtor's payment to Equitable of the purchase price of the property, or as a source of funds for damages to Equitable if damages are later found to be owing. Accordingly, under the circumstances, the Debtor is directed to deposit $12,500.00 per month, payable on or before the fifth day of each month, into the Court's escrow account. This fund will ensure adequate protection of Equitable's interest, as well as support the Debtor's ability to effectuate a plan of reorganization.

(b) *Remand issue*: Regarding Equitable's request for relief from the automatic stay to pursue the District Court action, the Court denies such relief at the present time and instructs the parties to inform the Court of any ruling issued by the Fifth Circuit on the appeals filed by Equitable in the District Court action. Depending on the outcome of the appeals, this Court will enter an appropriate order at a later date. The Court notes, however, that while considerations of judicial economy and efficient allocation of judicial expertise seem to militate in favor of remand of the issues pending in the District Court action, no remand is appropriate until the procedural posture of this Title 11 U.S.C. reorganization case is stabilized. This Court is the appropriate forum for effecting and supervising a Chapter 11 reorganization.

(c) *Interest on escrow fund*: The Court notes that the District Court's order requiring the posting of security required the Debtor to post a bond or cash. The District Court did not impose a requirement that the security bear interest for inclusion in the fund. Interest was not mentioned. The fund constituted the protection. Therefore, this Court will allow, as the District Court apparently did, the Debtor to receive the interest on the fund deposited with this Court.